J-A16040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.J.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.G.C., MOTHER | : : : : : : | |
| | : | No. 297 EDA 2022 |

Appeal from the Decree Entered December 27, 2021
In the Court of Common Pleas of Lehigh County at No(s):  A 2021-0031

| | | |
|---|---|---|
| IN RE:TERMINATION OF PARENTAL RIGHTS TO::T.M.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.G.C., MOTHER | : : : : : | |
| | : | No. 302 EDA 2022 |

Appeal from the Decree Entered December 27, 2021
In the Court of Common Pleas of Lehigh County at No(s):  A 2021-0032

BEFORE:  McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 28, 2022**

---

[*] Retired Senior Judge assigned to the Superior Court.

S.G.C. (Mother) appeals from the December 27, 2021 decrees of the Court of Common Pleas of Lehigh County (trial court) terminating her parental rights to H.J.M. and T.M.M. (collectively, Children).[1]  We affirm.

**I.**

We glean the following facts from the certified record.  The Lehigh County Office of Children and Youth Services (CYS) took emergency custody of Children in September 2019 and they have remained with their foster family since that time.  This current period of placement is the Children's third.  The first period of placement began in November 2014 when H.J.M. was removed from Mother and Father's care due to their illegal drug use.  T.M.M. was born dependent on drugs a week after H.J.M.'s placement.  Both parents were incarcerated due to probation violations stemming from drug charges and entered treatment upon release.  After 20 months of placement, Children were successfully returned to their parents' care and their case was closed.

Father contacted CYS for aid in November 2017 when the family was facing eviction and could not pay rent.  A week later, Mother gave birth to the couple's third child, R., who was premature and had to remain in the Neonatal Intensive Care Unit for treatment before being released to Mother and Father's

---

[1] Mother filed separate notices of appeal from each order and we consolidated the appeals *sua sponte*.  **See** Pa. R.A.P. 513.  The trial court also terminated the parental rights of Children's Father and his appeals are pending separately at 295 and 299 EDA 2022.

care. In December 2017, Father told CYS he had relapsed and was using heroin and Xanax. A few days later, one of the Children found R. unresponsive at home and he was pronounced dead at the hospital. After testing positive for illegal substances, Mother and Father agreed to a safety plan for Children. However, CYS once again took custody of Children after Mother violated the safety plan by having unsupervised custody of Children. They remained in foster care until September 2018 while an investigation in R.'s death was conducted. Allegations of abuse were determined to be unfounded and CYS closed the case again in March 2019.

CYS began to receive new referrals for the family in June 2019 following alleged drug use by both parents and improper supervision of Children. In September, they were evicted from their home and moved in with Mother's sister, Brandi. At that time, CYS received reports that Mother and Father were taking Children to panhandle in Emmaus at 10:00 at night. Brandi eventually notified CYS that the Children could no longer stay in her home because she discovered that Father had left a hypodermic needle in the bathroom within reach of Children. CYS took emergency custody of Children again and they remained with their current foster family for the 27 months leading up to the termination proceedings.

CYS ultimately filed petitions to terminate Mother's parental rights on April 20, 2021, after Children had been in placement for 19 months. The trial court held hearings on the petitions in November and December 2021 and

- 3 -

heard testimony regarding the parents' compliance with their reunification plan from CYS caseworkers, the evaluators who conducted their protective parenting evaluations, the Court Appointed Special Advocate (CASA), Children's therapist, their foster father, Mother and Father.

As part of their reunification plan, Mother and Father had to find appropriate housing and maintain steady income. They nonetheless continued to live with Brandi for over a year even though Children could not be returned to that home because it had a single bedroom for five residents and Brandi had an open case with CYS. Additionally, their probation officers warned them that they could be found in violation if they remained in that home because they did not have permission from Brandi's landlord to stay there.

By January 2021, they found their own apartment and were able to afford their rent and renew their lease for 2022. The apartment had separate bedrooms for Children and CYS agreed that it was an appropriate home. Mother had been working for McDonald's for over a year by the time of the termination proceedings and had progressed to a shift supervisor position. Father had held multiple jobs at different times but remained consistently employed since December 2019. Together they were financially stable and had accumulated savings. Despite their employment, however, Mother and Father refused to provide CYS with proof of income until ordered by the trial court during the November 2021 termination hearings. Their CYS caseworker, Amy Herczeg, testified that she had repeatedly requested documentation from

Mother and Father throughout Children's placement but was unable to verify their income because they refused to cooperate. Mother and Father testified that they provided proof of income to their Valley Youth House caseworker, who helped them develop household budgets, and expected that caseworker to relay the information to CYS. They also did not provide CYS with the updated budgets that they developed with Valley Youth House, despite CYS's numerous requests. As a result, CYS could not confirm prior to the termination hearings that they were financially able to support Children.

Both parents were also required to complete drug and alcohol evaluations, follow recommendations for treatment and submit to drug testing. Mother was incarcerated on new criminal charges shortly after CYS took emergency custody of Children the third time. She was released to an in-patient treatment program in December 2019 and has remained sober since completion of that program in January 2020. She continued to attend a dual diagnosis mental health and substance abuse treatment program after completing inpatient treatment. At the time of the termination proceedings, she had been using Subutex for two years to minimize the symptoms of heroin withdrawal. She had not started to wean off the medication and did not know when she would begin that process. Both parents were drug tested regularly as a condition of probation following their release from incarceration and had not tested positive during Children's third period of placement.

Mother and Father attended supervised visits with Children throughout their placement, beginning with one-hour visits once a week. At times, the visits were conducted virtually due to the Covid-19 pandemic. It was more difficult for Children to focus during the virtual visits and the caseworker and Children's therapist testified that Father sometimes appeared to be falling asleep during those visits. Father would also occasionally ask the Children inappropriate questions, such as when they were coming home. He and Mother would show Children pictures of items such as video games and their TV and tell them they could play with the games when they came home. In 2021, the visits increased to twice a week, and in September of that year, they increased from one to two hours. Children's therapist, CASA and their foster father testified that Children experienced increased anger and behavioral issues as their visits with Mother and Father increased in length and frequency. They attributed these behavioral problems to the uncertainty surrounding their foster placement and return to Mother and Father, as Children expressed anxiety and stress because they did not know where they would be living in the long-term. However, Children did recognize Mother and Father as their parents and showed affection toward them during the visits. Mother and Father were not able to progress to unsupervised visits in the 27 months the Children were in placement.

Finally, Father and Mother were required to complete protective parenting evaluations and follow through with any recommendations for treatment. The trial court summarized their progress on this front as follows:

[CYS] directed the parents to Valliere and Counseling Associates, Inc., and Forensic Treatment Services ("FTS") for these evaluations, but after completing some research about FTS, the parents came to believe the provider focused on treating child molesters and wanted nothing to do with FTS. In response, the Agency offered a second provider, PA Forensics, to whom the parents could go for the protective parenting evaluations since they were adamantly opposed to going to FTS. Similar to their refusal to provide financial information to []CYS, the parents staunchly refused for approximately 19 months to complete the court-ordered protective parenting evaluations.

Both parents eventually completed protective parenting evaluations at FTS. . . . Father's interview was completed on May 5, 2021, while Mother's was completed on May 27, 2021. After the evaluations were complete, the preliminary professional recommendation was that both parents were in need of protective parenting treatment, neither parent should be the sole caregiver to the children until the parent completed protective parenting treatment, and supervised visitation with the children should continue. The written report regarding Father's evaluation was completed on May 26, 2021, by Dr. Aaron Myers of FTS, while the written report regarding Mother was completed on September 10, 2021, by Jenna Rau, MA, LPC in conjunction with Dr. Bradley Beckwith, both of FTS.

According to Ms. Rau and Dr. Myers, both parents minimized their relapses, exaggerated their periods of sobriety, minimized the amount of time [Children] had been in care, and minimized the reasons the children had to be in care. Both had a lengthy, significant history of substance abuse. Neither seemed to have any understanding of the emotional impact on [Children] of the parents' substance abuse or the impact of going back and forth repeatedly from parental care to foster care, including the losses the children suffered as a result. Both tried to be perceived in a favorable light rather than honestly acknowledge[ing] the many instances where substance abuse had played a larger role in their placing the health, safety, or welfare of their children at risk.

Although they vocalized that they accepted responsibility for their actions, the story each parent told during their respective interviews about the situation they were in was one of blaming others rather than an authentic, self-reflective assessment of the situation they had created with their choices and actions.

The trend of trying to be seen in a favorable light occurred both during the interviews and in the testing FTS attempted with Mother and Father. Three tests were administered to each parent: The Parental Stress Index, 4th edition ("PSI"); the Parent Child Relationship Inventory; and the Child Abuse Potential Inventory ("CAPI"). Mother tried so hard to put her best foot forward that she invalidated two of the tests, and they could not be scored or interpreted because she exceeded the "faking good" validity score of the two tests. The same occurred with Father with one of the three tests. The remaining tests that were valid tended to show that the parents did not have a realistic view of the relationship they have with their children and did not have an honest handle on the challenges of parenting.

Additional issues with Father were linked to his extensive criminal history and some narcissistic traits. He described his own parents as substance abusers and was aware of how their addiction issues impacted him, but he thought that his addiction had never really impacted his own children. Similarly, he was aware that his children had experienced trauma as a result of []CYS's involvement, but he attributed the children's trauma to their being away from him, and from the uncertainty of not knowing when they would come home, rather than being able to recognize the impact his choices and behaviors had had on the children. He felt that now that his addiction was managed, he was a great parent and everything was fine. He also attributed most of his criminal behavior to his drug use and did not take accountability for the other aspects of his criminal behavior.

Dr. Myers indicated it could be reasonable for Father's treatment to take two years or more because the narcissistic traits and lack of empathy evident in Father's evaluation are typically intransigent and difficult to overcome. He explained it can take people about a year to recognize those things in themselves and another year to really make a change; given Father's history of relapse and inconsistency, he clarified that stability should be maintained for a long time before adding additional responsibilities such as child-rearing. Dr. Myers recommended that Father have

- 8 -

only supervised visits with his children until he was able to address his criminality and personality issues; he should remain in a substance abuse program and continue submitting to regular urinalysis to demonstrate sobriety; he should attend protective parenting treatment to address some of his neglectful behavior toward the children and learn how criminality and narcissistic traits could impact his relationship with his children.

***

Father began protective parenting treatment in August of 2021, while Mother began treatment in September of 2021. At the time of the termination hearing, neither parent had completed protective parenting treatment. Neither was in a position to be able to assume parental responsibilities for [Children], and the necessary length of time in treatment was unknown but expected to be at least one to two years for each parent.

At the hearing, on cross-examination, both Ms. Rau and Dr. Myers were asked to consider the fairly long period of compliance the parents have had with most of the court-ordered services, save the protective parenting treatment. Both evaluators indicated that the parent's compliance was a positive indicator, but it did not change the evaluator's treatment recommendations or the need for each parent to complete protective parenting treatment in order to be a safe, appropriate parent capable of permanent reunification with the children. They explained that regardless of the length of time the parents may have had stable housing, ongoing employment, clean urine screens, or attendance at substance abuse treatment, having insight into substance abuse issues and the impact on oneself and one's family is the key to successfully managing addiction so that potential triggers can be adequately identified to minimize the potential risk for relapse. They identified insight as the primary relapse-prevention strategy for an addict: A person could appear to be compliant for an extended period of time (just as Mother and Father have twice before, resulting in the return of [Children] to their parents' care) but, without insight, the person would probably not have addressed the underlying issues of the substance abuse and its impact on themselves or their family members and it would be simply a matter of time or circumstance until a relapse occurred. Overall, both evaluators concluded that both Mother and Father are lacking in insight into their addictions and the effect on their

families, the role their choices played in the []CYS involvement, and the impact on the children.

Trial Court Opinion, 12/27/21, 15-20 (citations and footnotes omitted).

Following four days of testimony, the trial court issued decrees terminating Mother's parental rights and an accompanying opinion explaining its rationale. Mother timely appealed and she and the trial court have complied with Pa. R.A.P. 1925.

## II.

On appeal, Mother argues that the trial court abused its discretion in finding clear and convincing evidence to terminate her parental rights under 23 Pa.C.S. § 2511(a) and (b).[2] Section 2511 of the Adoption Act governs termination of parental rights and requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best

---

[2] We review the trial court's decision for an abuse of discretion. **In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

- 10 -

interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted). "A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (citation omitted).

## A.

First, Mother argues that CYS did not provide clear and convincing evidence to establish grounds for termination under subsections 2511(a)(1), (5) and (8).[3]

---

[3] Those provisions provide:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable

*(Footnote Continued Next Page)*

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.*, 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)).  Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted).

The trial court concluded that CYS had met its burden of establishing that Mother's parental rights should be terminated pursuant to subsections 2511(a)(1), (5) and (8).  When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a),

---

period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

as well as Section 2511(b), to affirm the order. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we will focus on subsection 2511(a)(8)'s requirement that the conditions leading to Children's removal for 12 months or more continue to exist and that termination will serve Children's best interests.

Termination under subsection 2511(a)(8) does not require consideration of the parent's willingness or ability to remedy the conditions that led to the child's placement if the conditions continue to exist. ***S.C.***, ***supra***, at 1105. Even if a parent has made progress in remedying the conditions and could potentially parent the child successfully in the future, termination is justified if the conditions continue to exist after 12 months in placement and it would serve the needs and welfare of the child. ***In re S.H.***, 879 A.2d 802, 806-07 (Pa. Super. 2005) (holding that conditions leading to placement continued to exist when two witnesses testified that mother would need to show progress in treatment and sobriety for two years before she could parent child).

In its opinion, the trial court acknowledged that Mother had made significant progress in many parts of the reunification plan, particularly by obtaining housing and steady employment, maintaining her sobriety and regularly attending supervised visits with Children. However, the record supports the trial court's conclusion that there was clear and convincing evidence that after 27 months, Mother's progress in some areas did not alleviate all the conditions that led to Children's placement. ***See S.H.***, ***supra***.

First, the trial court observed that Mother had been using Subutex for two years to maintain her sobriety and had not yet begun to wean off the drug. Mother additionally admitted that she cannot be sure how weaning off the drug will impact her sobriety, even though she did not have any desire to use drugs. Thus, the trial court weighed Mother's current period of sobriety against her two prior relapses that occurred when Children were returned to her care and was concerned that the added stress of full-time parenting may trigger another relapse. *See* Trial Court Opinion, 12/27/21, at 11-13 & n.21.

The trial court also credited the testimony of Ms. Rau and Dr. Beckwith, who both administered Mother's protective parenting evaluation. Ms. Rau testified that Mother was deceptive in the interview, minimized the periods of time Children spent in placement and overstated her periods of sobriety. She did not recognize the emotional impact her actions and addiction had on Children or have any insight into her addiction. She blamed others for the effect the dependency had had on her family and attempted to redirect the interview to place herself in the best possible light. Finally, she produced invalid scores on two of the tests by "faking good" in her answers. Mother had begun protective parenting treatment in September 2021, several months after CYS filed the termination petitions, but based on her evaluation, Ms. Rau

testified that Mother would need additional treatment before serving as a primary caretaker to Children or even having unsupervised visitation.[4]

The trial court also observed that Mother unreasonably delayed undergoing the protective parenting evaluation for 19 months because she and Father looked up FTS and concluded that the organization only treated sexual offenders. It characterized this excuse as "rubbish" and observed that if she had complied with the requirement when it was originally ordered, she would have been substantially closer to reuniting with Children by the time the termination petitions were filed. **See** Trial Court Opinion, 12/27/21, at 25-26 & n.33. We decline to disturb the trial court's credibility and factual determinations, as they are supported by the record. **See A.S.**, **supra**.

Based on this evidence, the trial court correctly concluded that CYS had presented clear and convincing evidence that deficiencies in parenting that led to Children's placement had persisted for well over the 12 months prescribed

---

[4] Mother focuses her argument on attacking Ms. Rau's testimony that Mother lacked stability in her life, a point on which she thoroughly cross-examined Ms. Rau at the hearing. At that time, Ms. Rau conceded that Mother had demonstrated stability by obtaining a home and steady employment and maintaining her sobriety. She nonetheless opined that Mother's lack of insight into her addiction and refusal to take responsibility were poor indicators for her ability to care for Children in the long-term, particularly in light of her prior relapses. The trial court heard this testimony and considered the cross-examination before crediting Ms. Rau's opinion that Mother could not safely parent full-time or have unsupervised visits with Children until she completed further treatment. Because this credibility determination was supported by the record and within its province as fact-finder, we may not disturb it on appeal. **See A.S.**, **supra**.

in subsection 2511(a)(8). Moreover, as we address *infra* in our analysis of Section 2511(b) terminating Mother's parental rights will best serve Children's needs and welfare. Accordingly, CYS presented sufficient evidence to support termination under subsection 2511(a)(8).

**B.**

The next step of our inquiry is whether the termination is in the best interests of Children. There are several factors to consider in this analysis:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015); *In re M.Z.T.M.W.*, 163 A.3d 462, 464 (Pa. Super. 2017). It is sufficient for the court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.*

Moreover, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*,

- 16 -

71 A.3d 251, 267 (Pa. 2013) (citation omitted). The court may consider intangibles such as the love, comfort, security and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, *supra* at 1121.

In considering this factor, the trial court acknowledged that Mother and Children have a bond and they are affectionate toward her during visits. However, this bond is only one factor of the best interests analysis, and the trial court was also required to consider Children's safety, stability, security and other intangibles that may or may not be present in the parent-child relationship. *C.D.R.*, *supra*. Here, the trial court recognized that Children have been greatly affected by their three periods of placement and have continued to express worry and anxiety regarding whether they will return to their parents. Several witnesses at the termination hearing, including the CASA, Children's therapist, their foster father and a CYS caseworker testified that after the number of visits with their parents increased in 2021, Children regressed and they exhibited more aggression, anger and out-of-control behavior. They testified that behaviors appeared related to uncertainty about their futures, as Children would be hopeful about returning home and then upset following review hearings with no resolution. Children's therapist and caseworker believed that they needed security and stability after years of placement in order to feel safe.

Further, Children had adapted well to their foster family and their foster parents were willing to serve as an adoptive resource. Their foster parents ensured that they received necessary medical care, dental care and therapy and attended extracurricular activities and family trips. Children get along well with their foster siblings and refer to their foster parents as "mommy" and "daddy." At the time of the termination hearings, Children were scheduled to begin in-home trauma therapy at their foster home. After reviewing this evidence and considering the negative effect of the prolonged uncertainty about their futures, the trial court concluded that termination of Mother's parental rights would be in Children's best interests and would provide them with the greatest degree of permanence and stability. This conclusion was supported by clear and convincing evidence and Mother's claim that the trial court failed to properly evaluate her bond with Children is meritless.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/2022